UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

BRANDON SIMS,

     Defendant.

Case No. 23-20602
Honorable Laurie J. Michelson

---

**OPINION AND ORDER ON DEFENDANT'S MOTION TO DISMISS THE INDICTMENT [29] AND SUPPRESS STATEMENTS [30]**

---

Brandon Sims, a prior convicted felon, is accused of carjacking his partner and her friend and discharging a firearm in the process. He has been indicted on one count of carjacking, one count of using, carrying, and discharging a firearm during and in relation to a crime of violence, and one count of being a felon in possession of a firearm, all in violation of 18 U.S.C. §§ 2119, 924(c), and 922(g). Sims now seeks to dismiss this indictment because he believes the government destroyed evidence material to his defense. He also seeks to suppress all statements he made to law enforcement after his arrest and prior to his receipt of any *Miranda* warnings. The government opposes the motions. Having reviewed the parties' briefing as well as the evidence and testimony presented at the hearings, the Court finds no basis for dismissal or suppression of all of Sims' statements. Thus, the motion to dismiss is DENIED and the motion to suppress is GRANTED IN PART AND DENIED IN PART.

## I.

The following evidence presented during the motion hearing (ECF No. 42) and subsequent evidentiary hearing (ECF No. 43) corroborated and supplemented the details set forth in the criminal complaint (ECF No 1).

On October 18, 2023, a few days after Brandon Sims physically assaulted DG, his pregnant girlfriend and the mother of his child, she asked her friend JW to help her retrieve her belongings from Sims' residence in Detroit. (*Id.* at PageID.3; ECF No. 43, PageID.296–298.) Sims and DG loaded her belongings into JW's Ford Explorer, and DG got back into the front passenger seat beside JW. (ECF No. 1 at PageID.4.) Sims asked DG if she was going to get the rest of her things from another house. (*Id.*) He then got into the back seat of the vehicle and directed JW to drive to the other house. (*Id.*) As JW was turning onto Constance Street, as directed by Sims, Sims suddenly said, "put your seatbelt on." (*Id.*) JW then turned around and saw that Sims was pointing a handgun at his head. (*Id.*)

JW pushed the gun away and a shot was discharged. (ECF No. 43, PageID.287, 315.) DG screamed at JW to run. (*Id.*; ECF No. 1, PageID.5.) JW jumped from the vehicle, ran to a nearby house, and called 911. (*Id.*) He reported the carjacking and shooting to responding police officers. He also disclosed that DG was in an abusive relationship with Sims. (ECF No. 43, PageID.289, ECF No. 1, PageID.5.)

Sims got into the driver's seat of JW's Explorer and drove away with DG still inside. (ECF No. 1, PageID.5.) Sims later texted JW something to the effect of, "Bro, if I wanted to take your life or money, I would have, but I ain't want shit. You was

just the one driving bro." (*See* ECF No. 32, PageID.122.) JW responded, "Alright, where is my whip?" Sims replied that he was driving it and that he would return it to JW that evening. (*Id.*) About an hour later, JW received another text message that stated, in part, "I kill or die before I feel un ez as well it's up see u n few." (*Id.*) Sims also made a FaceTime call to JW during which he pointed the handgun at the camera and told JW that he would "get a chopper," i.e., an AK-47 style weapon. (*Id.*; ECF No., PageID.5.)

JW shared these texts with law enforcement. (ECF No. 43, PageID.289–290.) They were understandably concerned for DG's safety and worked to locate her. (*Id.* at PageID.291.) Through a state search warrant, they were able to trace the phone sending the text messages (which they believed was Sims' phone) to the area of Arthur Street in Pontiac, Michigan. (*Id.* at PageID.293.) Sims had previously provided the Michigan Department of Corrections with a home address on Arthur Street. (ECF No. 1, PageID.6.) The officers established surveillance and during the evening hours of October 18, 2023, Sims was observed near and at the Arthur Street residence. (*Id.*) He was eventually taken into custody at a convenience store but refused to disclose DG's exact whereabouts. (*Id.*)

A short time later, while officers were seeking permission to search the Arthur Street house from one of its other residents, DG emerged from the home. (*Id.* at PageID.7.) She spoke with the officers and confirmed that Sims took JW's car after holding JW at gunpoint and that he fired a shot from his handgun. (*Id.*; ECF No. 43, PageID.296.) DG also provided information about where Sims had abandoned JW's

Ford Explorer. (ECF No. 43, PageID.300.) (At oral argument, defense counsel indicated DG may have given a different statement to their investigator. But that statement is not in the record.)

The officers were then given consent to search the Arthur Street home. (ECF No. 1, PageID.7.) The officers found a loaded 9mm Smith and Wesson handgun that no resident claimed ownership of. (*Id.*) The officers subsequently obtained a search warrant and found Sims' wallet near the handgun. (*Id.*) The gun, having a capacity of 16 rounds of ammunition, was loaded with only 14 rounds. (*Id.*)

The next day, on October 19, 2023, JW identified Sims from a photo array as the person who allegedly carjacked him. (*Id.* at PageID.8.) That was also the day that officers recovered JW's Ford Explorer. (ECF No. 43, PageID.300.) They observed that a gunshot had penetrated the driver's side window and driver's side mirror. (ECF No. 32, PageID.125.) The evidence response team processed the vehicle on October 20, 2023. (ECF No. 43, PageID.303.) They took numerous photographs of the interior and exterior of the car, including of the bullet hole, and then returned the vehicle to JW the same day. (*Id.* at PageID.303, 309, 352; ECF No. 32, PageID.125, 127, 136.)

That was also the day Sims was charged in a criminal complaint with carjacking, discharging a firearm during a crime of violence, and being a felon in possession of a firearm. (ECF No. 1.) He was indicted on those charges a few days later, on October 25, 2023. (ECF No. 10.)

Sims now moves to dismiss the indictment for an alleged *Brady* violation because the government failed to preserve the driver-side window of JW's Ford

Explorer as evidence. He asserts that the officers returned the Explorer to JW before Sims' firearm expert could examine the bullet hole. (ECF No. 29.) Sims also moves to suppress the un-*Mirandized* statements he made to law enforcement following his arrest as violative of his due process rights. (ECF No. 30.) The government opposed the motions (ECF Nos. 32, 33) and the Court held oral argument on February 21, 2025, and a limited evidentiary hearing on March 13, 2025. For the reasons detailed below, the record does not support dismissal of the charges or suppression of all the statements.

## II.

The Court starts with the alleged *Brady* violation.

As part of his defense, Sims seeks to challenge that he discharged a firearm from the back seat of JW's Ford Explorer and that the shot came from the 9mm firearm found in his residence. (ECF No. 29, PageID.98.) While law enforcement took a few photographs of the bullet hole in the driver's side window, they did not take any measurements of the hole or its trajectory. (*Id*. at PageID.102.) Sims has retained an expert in the field of firearm and munition science who opines that "if the window was available for examination and testing" it would have been possible to assess both the caliber and trajectory of the bullet that traveled through the window and determine whether the shot was most likely fired from the front or back seat. (ECF No. 29-1.) The expert further avers that "without the ability to physically examine the window or measure the bullet hole, [his] ability to make such a determination to a reasonable degree of scientific certainty is hampered irreparably." (*Id*.) Being

5

deprived of this examination and testing, says Sims, was the result of law enforcement's decision to not preserve the window. (ECF No. 29, PageID.99.) And, continues Sims, this prejudiced his ability to lodge a defense and receive a fair trial in violation of his due process rights. (*Id.*)

As Sims recognizes, "[s]eparate tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible, versus cases where 'potentially useful' evidence is not accessible." *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). If the government suppresses evidence that is "materially exculpatory" and prejudice ensues, a due process violation (specifically, a *Brady* violation) occurs regardless of whether such suppression was willful or inadvertent. *See, e.g.*, *United States v. Tavera*, 719 F.3d 705, 710 (6th Cir. 2013) (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)). To be considered materially exculpatory, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

But if the evidence suppressed is only "potentially useful," the defendant must show that the government acted in bad faith by failing to preserve it in order to demonstrate a due process violation. *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002) (citing *Youngblood*, 488 U.S. at 57). In other words, the Due Process Clause does not impose upon the police "an undifferentiated and absolute duty to retain and

to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58.

Sims' brief and his firearm expert's affidavit make clear that the vehicle window was only *potentially* useful evidence depending on the results of the analysis of the bullet hole. (*See* ECF No. 29, PageID.104 ("Law enforcement's failure to preserve the vehicle in this case amounts to a *Brady* violation because the vehicle was and contained evidence known to law enforcement to be significant to the case[] [and] was material and *potentially* exculpatory." (emphasis added)).)[1]  In other words, the basis for Sims' due process challenge is that the government failed to "preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated" him. *Wright*, 260 F.3d at 571 (quoting *Youngblood*, 488 U.S. at 57); *see also Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (deeming destroyed evidence only "potentially useful" when, "at most, [the defendant] could hope that, had the evidence been preserved, a fifth test conducted on the substance would have exonerated him").

Since the evidence is only potentially useful, the *Youngblood* standard applies and Sims must demonstrate that: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that

---

[1] During oral argument, counsel likewise acknowledged that they do not know what the window testing would show, but have to assume it *could* be exculpatory—recognizing, therefore, that the results could also be inculpatory. (*See* ECF No. 42, PageID.246–247.)

the defendant would be unable to obtain comparable evidence by other means." *Monzo*, 281 F.3d at 580 (citing *Youngblood*, 488 U.S. at 57). "The first two elements of this tripartite test are inter-related," because "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (quoting *Youngblood*, 488 U.S. at 56–57). These elements are not satisfied here.[2]

To start, at the time the case agent, FBI Special Agent Christopher Pennisi, returned the vehicle to JW on October 20, 2023, the bullet hole in the window was far more inculpatory of Sims than exculpatory. The police had consistent witness statements from JW and DG that JW had been carjacked by Sims and that Sims discharged a firearm from the backseat. As corroborating evidence, the vehicle was abandoned and had to be recovered. When it was located, there was clearly a bullet hole in the driver's side window. And a shell casing was recovered from the front passenger seat floorboard, which confirmed a shot was fired inside the car. Agent Pennisi testified that the location of the shell casing was consistent with the trajectory a bullet could take from a gun fired from the backseat. (ECF No. 43,

---

[2] As an aside, Sims often refers to the "destruction" of the window. (ECF No. 29, PageID.99, 105, 107–108.) But neither party knows what happened to the window after the vehicle was returned to JW and whether it may still exist somewhere. Sims says it does not matter because the evidentiary value was lost when the government failed to preserve it. But the evidentiary value may have been equally compromised during the day that the vehicle was missing before the police recovered it. During this time, Sims drove the vehicle, its driver's side door was opened and closed, and it sat in a parking lot where any number of people could have touched the window.

PageID.343.) So the police had no reason to think the shot may have come from someone other than Sims. As Pennisi testified, there was no evidence that anyone else in the car even had a gun. (*See* ECF No. 43, PageID.300.) Thus, nothing suggested the window had *any* exculpatory value. And, indeed, it is purely speculative whether further analysis of the bullet hole would have demonstrated that the shot could not have come from the back seat. *See United States v. Gaither*, 65 F. App'x 514, 517 (6th Cir. 2003) (finding no due process violation where "there was every reason for police officers to believe that the [missing evidence] was inculpatory").

Additionally, Sims has presented no evidence of bad faith. And "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58.[3] To establish bad faith, "a defendant must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.'" *Jobson*, 102 F.3d at 218 (quoting *Trombetta*, 467 U.S. at 488). Mere negligence, even gross negligence, by the government in failing to preserve potentially exculpatory evidence does not establish bad faith. *Wright*, 260 F.3d at 571–72.

Here, explained Agent Pennisi, JW's vehicle was retrieved on October 19, 2023. It was taken to a nearby FBI automotive garage for processing, where, the next day, officers tested for DNA and fingerprints, searched for physical evidence, took over 60

_____

[3] Sims suggests, and his counsel reiterated at the hearings, that failure to preserve material evidence, by itself, constitutes bad faith. (ECF No. 34, PageID.157; ECF No. 42, PageID.266.) But that would eliminate the bad faith element from the *Youngblood* test.

photographs (including three of the bullet hole), and prepared a report. Pennisi then returned the vehicle to its owner, JW. Pennisi testified that this was normal practice after exhausting the search for evidence. (ECF No. 43, PageID.309.) He further testified that he did not return the vehicle to circumvent any disclosure requirements or to suppress any exculpatory evidence. (*Id.* at PageID.310.) And he disclaimed any animus toward Sims. (*Id.*) It is difficult to characterize this return of the vehicle as even negligence, let alone anything more culpable. *See Jobson*, 102 F.3d at 218 (holding that, despite "the government's dilatory response to defendant's discovery requests," the government did not act in bad faith because "[t]here is no evidence that anyone . . . suspected that the tape was exculpatory" and "[t]he tape was erased not as a result of malice, but routine police department policy"); *Wright*, 260 F.3d at 572 ("Even if the fire investigators were negligent in failing to preserve electrical evidence, negligence does not constitute bad faith.").

In short, "[t]he record contains no allegation of official animus toward [defendant] or of a conscious effort to suppress exculpatory evidence." *Wright*, 260 F.3d at 571. Returning the vehicle to JW and thereby failing to preserve the window with the bullet hole did not violate Sims' due process rights under *Youngblood*. *See Wright*, 260 F.3d at 571 (rejecting defendant's argument that "the destruction of electrical evidence [that] prevented his expert from conducting future tests, the results of which may have exonerated him," violated his due process rights).

And even if the materially exculpatory test applied, Sims would fare no better. As discussed, given the information known to law enforcement, the exculpatory value of the window was not readily apparent at the time the vehicle was returned to JW.

Thus, whether applying the test for potentially exculpatory evidence or the test for materially exculpatory evidence, Sims cannot show that the government's failure to preserve the driver's side window of JW's Ford Explorer violated his due process rights. So there is no basis to dismiss the indictment.

### III.

The Court next turns to Sims' motion to suppress.

Sims was arrested in a convenience store near the Arthur Street residence on October 18, 2023, at around 8:30 pm. He was taken to the parking lot where multiple officers asked him questions without advising him or seeking a waiver of his *Miranda* rights. (ECF No. 30, PageID.113; *see* Hr'g, Feb. 21, 2025, Ex. 1.) The government acknowledges that Sims "made some comments while with the police." (ECF No. 33, PageID.140.) Sims says this was a violation of his Fifth Amendment right against self-incrimination. (ECF No. 30, PageID.113–114.) To remedy this violation, Sims seeks to suppress the "statements, gestures, and utterances" he made during his custodial interrogation. (*Id*. at PageID.114.)

In his opening brief, Sims did not identify any of these "statements, gestures, and utterances." Nor in its response brief did the government identify any of the statements it intends to introduce at trial. The parties, though, subsequently provided Officer Hebner's body cam footage of the interaction (Hr'g, Feb. 21, 2025,

Ex. 1) and supplemental briefing as to the statements at issue (ECF Nos. 38, 39), including a transcript of Sims' statements as captured on the body camera video of Officers Hebner and Sullivan (ECF No. 38, PageID.170–184).

In *Miranda*, the Supreme Court held that an individual subject to custodial interrogation by the authorities must be notified of his right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). Statements made in the absence of *Miranda* warnings are inadmissible at trial. *Id.* at 479; *see also United States v. Hodge*, 714 F.3d 380, 385 (6th Cir. 2013) ("*Miranda* prohibits use by the government of statements stemming from custodial interrogation of the defendant to prove its case against the defendant, if those statements were made before the defendant was properly advised of his rights." (internal quotation marks omitted)).

For the *Miranda* rule to apply, the individual must be in custody and subject to interrogation. *United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995). Here, there is no question Sims was in custody. He was under arrest, placed in handcuffs, surrounded by numerous officers, and not free to leave. *See New York v. Quarles*, 467 U.S. 649, 655 (1984) (holding that defendant was in custody under *Miranda* when he was handcuffed and surrounded by at least four police officers when the questioning took place); *United States v. Ray*, 690 F. App'x 366, 372 (6th Cir. 2017) ("For starters, there is no dispute that Ray was handcuffed at the time and, thus, 'in custody' for *Miranda* purposes."). There is also no question that Sims was interrogated, the second requirement for *Miranda* rights to attach. Interrogation is defined as "express questioning or its functional equivalent"—that is, any words or actions by the police

that they should know "are reasonably likely to elicit an incriminating response from the suspect." *See Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

That said, as an initial matter, the beginning portions of Sims' interrogation, where he was asked whether he was armed and for biographical information, will not be suppressed. The Supreme Court has established that police need not read an arrestee his *Miranda* rights when asking questions about biographical information needed for the booking process, such as the arrestee's name, age, and address. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). And the Sixth Circuit has applied the same reasoning to conclude that questions about what is on an arrestee's person are generally exempt from *Miranda*'s coverage. *See United States v. Woods*, 711 F.3d 737, 741–44 (6th Cir. 2013).

But Sims says that prior to receiving any *Miranda* warnings, he was also "asked questions about the crime, what happened, where evidence was, his role, etc." that were "designed to [e]licit incriminating responses." (ECF No. 36, PageID.162.) Indeed, the officers' body cam footage of their post-arrest conversation with Sims reveals that the questioning went beyond mere background inquiries and that no *Miranda* warnings were ever given. (Hr'g, Feb. 21, 2025, Ex. 1; ECF No. 38.) The government argues that because the questioning was focused on finding DG, Sims' statements are admissible under another *Miranda* exception—the public safety exception.

In *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court held that statements obtained in violation of *Miranda* need not be suppressed when the

13

questioning is conducted to address an ongoing "public safety" concern. *Id.* at 654–657. "Especially in fast-unfolding situations possibly involving weapons, an officer's need to protect himself and the public can outweigh the suspect's risk of self-incrimination." *United States v. Davis*, No. 23-3447, 2024 U.S. App. LEXIS 4829, at *4 (6th Cir. Feb. 27, 2024). That was the situation in *Quarles*. Police knew a rape suspect had a gun but could not find it on his person. *Quarles*, 467 U.S. at 651–52. Concerned that someone else might recover the weapon believed to be hidden in a grocery store, the officer asked the suspect where it was. *Id.* at 652. Only after the officer found the gun did he *Mirandize* the suspect and ask further questions. *Id.* The Court held that the suspect's risk of self-incrimination was outweighed by the officer's need to protect himself and the public. *Id.* at 656–57. And the Court emphasized that the officer limited the risk of self-incrimination by asking "only the question necessary to locate the missing gun." *Id.* at 659.

In federal cases, this exception has typically been limited to "circumstances where a suspect has stored or abandoned dangerous evidence that may pose a threat to officers or to the general public, and the police ask questions designed to minimize the danger." *Williams v. Jacquez*, No. 05-0058, 2011 U.S. Dist. LEXIS 16442, at *24 (E.D. Cal. Feb. 18, 2011) (collecting Eighth and Ninth Circuit cases). In determining the applicability of the public safety exception, the Sixth Circuit considers factors including "the known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest." *United States v. Williams*, 483 F.3d 425,

14

428 (6th Cir. 2007). "For an officer to have a reasonable belief that he [or the public] is in danger, at minimum, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to the weapon and inflict harm with it." *Id*. Indeed, found the Sixth Circuit, "[t]he public safety exception applies if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety." *Id*.

Here, the officers did not question Sims about the location of a firearm or any other dangerous weapon—they were focused not on finding a firearm but on finding DG. Thus, they repeatedly asked Sims about her location and condition. Sims indicated that DG was not harmed but never gave a precise location. The government seeks to extend the public safety exception to this questioning.

While the Sixth Circuit has not yet done so, several federal courts in habeas cases and many state courts have applied the *Quarles* exception in situations where, as here, the police were attempting to find and/or protect a possible victim (as opposed to the general public or officers themselves) from immediate threat in various forms. *See, e.g.*, *Jacquez*, 2011 U.S. Dist. LEXIS at *25–28 (E.D. Cal. Feb. 18, 2011) (collecting cases).

In *Jacquez*, the Eastern District of California, on habeas review, "conclude[d] that the *Quarles* 'public safety' exception can reasonably be extended, in an appropriate case, to a situation involving the immediate safety of a victim, as opposed to the immediate safety of the police or the public in general." *Id*. at *33. The court

15

reasoned that "[w]here there is an objectively reasonable need to protect the possible victim of a crime from immediate danger, the police should be allowed to ask questions specifically designed to secure the safety of the victim"—but specified that "the questioning should be limited in scope, designed only to 'quell the volatile situation they face,' and should not be 'investigatory in nature.'" *Id.*; *see also Wilcox v. Warren*, No. 13-3524, 2015 U.S. Dist. LEXIS 167242, at *20 (D.N.J. Dec. 15, 2015) (concluding that public safety exception properly applied to questions concerning location of stabbing victim because there was an objectively reasonable basis for officer to conclude that the victim may need emergency medical care); *United States v. Way*, No. 17-40005, 2017 U.S. Dist. LEXIS 189791, at *15 (S.D. Ill. Nov. 16, 2017) (concluding that public safety exception properly applied to questions aimed at locating and apprehending defendant's alleged co-conspirator where the "Government's interest in finding [the co-conspirator] and rescuing her children—especially after [the co-conspirator] had just rammed her vehicle into a police cruiser with her children in her back seat—outweighs the need for the prophylactic rule").[4]

---

[4] Many state courts recognize the "rescue doctrine" as a corollary to the *Quarles* public safety exception that allows police to question a custodial suspect without first providing *Miranda* rights if the primary purpose of the questioning is to locate or protect a potential victim in immediate danger. *See, e.g.*, *State v. Kunkel*, 404 N.W.2d 69, 76 (Wis. Ct. App. 1987) (applying the rescue doctrine to admit the defendant's statements relating to the whereabouts of his missing daughter); *State v. Provost*, 490 N.W.2d 93, 96–97 (Minn. 1992) (adopting and applying the rescue doctrine to admit defendant's statements to the police to locate his wife who he had set on fire and was missing in a wildlife refuge); *State v. Mata*, 624 S.W.3d 824 (Tex. Ct. App. 2021) (ruling that police did not need to give Miranda warnings to a suspect during a roadside interrogation before asking him the location of a 15-year old child he allegedly kidnapped and was holding for ransom).

With this context in mind, the Court now returns to *Williams* and the factors the Sixth Circuit considers in determining the applicability of the public safety exception. The question for the Court is whether "officers have a reasonable belief based on articulable facts that they are [or the public is] in danger," where reasonableness is determined based on the "known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest." *Williams*, 483 F.3d at 428.

Here, the police had been advised by JW that Sims had a firearm and that he discharged it. They knew that Sims took JW's car with DG still inside. They were aware (from JW and reports in a law enforcement database) that Sims had previously been physically abusive to DG, including recently. At the time of Sims' arrest, DG had been missing for nearly eight hours. This delay, without any word from DG, exacerbated the concern over her well-being. It did not, as the defense argues, eliminate it or suggest that she was not still in imminent danger. In the pen register warrant for Sims' phone, signed about an hour before Sims' arrest, the affiant stated in pertinent part, "CATS [Commercial Auto Theft] members have not been able to locate DG and there is belief due to the statements of domestic violence between DG and Sims made by the [carjacking] complainant that DG may be in danger." (ECF No. 38, PageID.185–186.) Moreover, during the time that the police were surveilling the Arthur residence, DG was never seen. Nor was she with Sims when he went to the convenience store.

The Court believes it appropriate to extend *Quarles* and apply its logic to this unique factual situation. The Court appreciates that *Quarles* recognized only a "narrow exception to the *Miranda* rule," one that in each case is "circumscribed by the exigency which justifies it." *Quarles*, 467 U.S. at 658. And that questions fall within the exception only when they relate to an objectively reasonable need to protect the public from immediate danger, not when they are designed to elicit testimonial evidence from the suspect. *Id.* at 659 & n.8.

That is the situation here with respect to the early questioning of Sims. At the outset, one of the officers says, "in the interest of safety we can ask it" and then another officer immediately asks Sims, "where's uh [DG] at." (ECF No. 38, PageID.181.) Much of the follow-up questioning is focused on finding DG. But at least some of the officers then veer into asking Sims questions about JW's car and other questions that are more investigative in nature. That questioning will be suppressed.

Sims, though, wants all of his statements suppressed. During the hearings, his counsel focused on the short amount of time it would have taken to advise Sims of his *Miranda* rights. The suggestion is that given the many hours DG had already been missing, a few more minutes would not matter. But that misunderstands the purpose of the public safety exception. The issue is not how long it would take to administer *Miranda* warnings, but rather whether reading a suspect his *Miranda* warnings would prevent him from disclosing vital, potentially life-saving information. As the Supreme Court explained:

> [I]f police are required to recite the familiar *Miranda* warnings before
> asking the whereabouts of the gun, suspects in Quarles' position might

well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

*Quarles*, 467 U.S. at 657; *see also State v. Mata*, 624 S.W.3d 824, 830 (Tex. Ct. App. 2021) (Walker, J., concurring) ("If Appellee had been given *Miranda* warnings and he thereafter chose to remain silent in the face of the roadside interrogation, his silence could have created an imminent danger to the safety of the kidnapping victim, herself a member of the public, because her location was unknown and therefore her rescue was not at all assured."). As the California Court of Appeals aptly put it, "[w]hile life hangs in the balance, there is no room to require admonitions concerning the right to counsel and to remain silent." *People v. Dean*, 114 Cal. Rptr. 555, 559 (Cal. Ct. App. 1974).

In sum, the Court finds that the public safety exception should be applied to some of the questioning here. On the specific record before the Court, the police had reason to believe DG was in imminent danger and that they needed information from Sims to find her. But the questions asked must be directly related to the potential victim's location or safety, and not used to gather information about the crime itself. So the Court will only suppress the highlighted portions of ECF No. 38 attached to the end of this opinion.

One final note. The government obtains the benefit of this *Miranda* exception only as to the questioning aimed at finding DG. But this is not a kidnapping case, so the probative value of statements regarding DG's location is questionable. Irrespective of whether the statements are suppressed as a Fifth Amendment violation, the Court has serious doubts about their admissibility at trial under Federal Rule of Evidence 403.

## IV.

For these reasons, Sims' motion to dismiss the indictment for violation of his due process rights (ECF No. 29) is DENIED and Sims' motion to suppress his post-arrest statements for violation of his right against self-incrimination (ECF No. 30) is DENIED IN PART and GRANTED IN PART.

SO ORDERED.

Dated: April 7, 2025


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

**SIMS: I already swallowed it.**

UNK OFFICER: Oh.

OFFICER 1: All right man.

UNK OFFICER: This is your phone?

UNK OFFICER: Yeah, that's his.

OFFICER 1: What you want say?

**SIMS: I'll tell you whatever you wanna know, long as you go ahead and call my motherfucking uh, uh people right now and shit and tell 'em uh-**

UNK OFFICER: Who's your people?

**SIMS: Uh shit…**

[01:40]
OFFICER 1: Look, look, look, look, look at it young man. Look, any love that you want us to give you is fine. I respect that.

**SIMS: [U/I]**

[01:50]
OFFICER 1: Huh? What?

**SIMS: [U/I] I ain't running nowhere. Go ahead. You, you I know y'all look at me.**

[01:55]
OFFICER 1: My man.

**SIMS: I know who y'all looking for. I'm just trying to be respectful.**

UNK OFFICER: Where do you live at sir?

**SIMS: [U/I]**

2

&lt;radio&gt; &lt;unintelligible conversation&gt;

HEBNER: No.

**SIMS: [U/I]**

UNK OFFICER: Where?

HEBNER: Yeah.

[03:32]
**SIMS: Stay all over there. [U/I]**

HEBNER: Sorry. In, in the interest of safety we can ask, right? Hey uh, boss-

**SIMS: I stay all-**

**HEBNER: Where's uh Destiny at?**

[03:43]
**SIMS: Oh shit.**

[03:44]
HEBNER: Huh?
**SIMS: I left her ass...**

[03:45]
UNK OFFICER: Where?

[03:47]
**SIMS: In the city, dog.**

HEBNER: You left her, you left her-

**SIMS: In the city homie.**

HEBNER: Where shit happened? We trying to make sure she ain't hurt homie.

3

**SIMS: Man, she ain't hurt homie. I done cashed that nigga out and get the fuck on. Nigga started acting stupid as hell nigga. I left her ass in motherfucking city man.**

UNK OFFICER: Where at the city?

**SIMS: Dog on Six Mile. Motherfucking goddamn-**

HEBNER: Car bump

**SIMS: Six and Grove and shit, bro. I ain't did shit to her nigga.**

OFFICER 1: You, you know we need to make sure right?

**SIMS: Yeah. Like I said, look, I ain't did shit to her.**

**SIMS: But you know. Hey listen, y'all know the fuck I am. I got it and respect. I got you right now. Let me hold the floor. I'm right now, I'm right now hosting the show. Let me hold the floor.**

OFFICER 1: You hosting the show, huh?

**SIMS: Listen, like I said no, no, no[U/I].**

OFFICER 1: Okay, go ahead.

**SIMS: You know I did the shit.**

OFFICER 1: Go ahead.

**SIMS: Like I said, I ain't hurt her.**

OFFICER 1: But we need to confirm that.

**SIMS: [U/I] You heard me. I just told your ass. I I just told you I dropped her off in the hood. So now-**

OFFICER 1: Is she in the hood? Six Mile and, you said Six Mile and where?

**SIMS: Yeah. Uh, my hood and shit.**

4

OFFICER 1: Six Mile and where?

**SIMS: Six and Greenfield.**

UNK OFFICER: Greenfield.

OFFICER 1: Not over here?

**SIMS: No. I come the fuck down here. You feel me?**

OFFICER 1: Not with her.

**SIMS: No, because y'all done went over there in my little spot. I seen all shit come to my apartments so I'm like damn the fuck y'all coming over there for?**

UNK OFFICER: Whose house is this?

[05:01]
**SIMS:  Shit? That's all fucking people shit.**

OFFICER 1: Alright. So you asked me to call your people to tell 'em-

**SIMS: I just told you bro.**

OFFICER 1: Right.

**SIMS: Shit. I just told you bro. I don't know what else the fuck to say man.**

OFFICER 1: No, I'm just asking. I just wanna clarify what you asking us to do. You want us to call your people-

SIMS: I just told you bro. I just looked out.

OFFICER 1: That's not a trick question. I'm just asking.

SIMS: I said call my brother, I'm gonna let you know the, that you asked me. I asked you shit two times. Other than that-

OFFICER 1: [U/I]

5

**SIMS: I shit gave you questions for him bro.**

OFFICER 1: But we still need to put our eyes on her.

**SIMS: I know, that's what I'm saying. Like I take you show you in the city in the hood. Like this shit she ain't motherfuckin'-**

OFFICER 1: You put her in the house or you dropped her on the street?

**SIMS: No I ain't, on the streets.**

OFFICER 1: You dropped your baby mama on the street?

**SIMS: And at the time and shit-**

[05:43]
OFFICER 1: Y'all was mad at her or something?

**SIMS: No.**

[05:48]
OFFICER 1: Did you drop her off in your car or her car?

[05:50]
**SIMS: No, I dropped her off in the motherfucking little whip and shit I just caught. It ain't her motherfucking whip. Shit nigga gang, you feel me? What the fuck you mean? I'm out here moving and grooving every day. That shit just cop some shit from a motherfucker.**

[06:04]
OFFICER 1: So where the whip at?

[06:07]
**SIMS: It'll be back with the homie in a minute. Soon as every nigga get back-**

[12:30]
UNK OFFICER: Listen, we're trying to get-

**SIMS: [U/I]**

6

UNK OFFICER: No, we're trying to get done with this shit. I've been on this shit all day. Okay?

**SIMS: [U/I]**

UNK OFFICER: [U/I] Call dispatch.

**SIMS: [U/I] some fucking shit. Worry about my bitch. Other than that, what the fuck for? Other than that, what the fuck for? That shit extra.**

UNK OFFICER: We find out she's, all we gotta do is put eyes on her and we're outta here. We're home.

[12:55]
UNK OFFICER: You dropped her off where?

**SIMS: In the city.**

UNK OFFICER: You know where, so where?

**SIMS: [U/I]**

UNK OFFICER: Six and Greenfield. What was the, what was it? Just get out, get out right here at the intersection. Was it a gas station, was it a McDonald's? What was it?

**SIMS: [U/I]**

UNK OFFICER: Huh?

**SIMS: [U/I] Mile. I didn't pay attention.**

UNK OFFICER: You didn't pay attention? You, you're not from down there?

**SIMS: Yeah, I am.**

UNK OFFICER: Okay, then why-

**SIMS: [U/I] I got the fuck outta there. [U/I] rolled a blunt. That's nigga start texting, talking all that crazy shit.**

7

UNK OFFICER: Who?

[14:19]
**SIMS: You know who what the fuck who.**

UNK OFFICER:  I don't know who you're talking about.

[14:20]
**SIMS: Man, y'all know who the fuck who. I just spoke to y'all so y'all can have some shit. So motherfucker come up from bro. Now you trying to be like, you want some extra shit.**

[14:27]
UNK OFFICER: Now, when you say somebody's been texting you, there could be a hundred people fucking texting you. I don't know who you talked to.

[14:33]
**SIMS: It was, it was, it was two to make you have my motherfucker interest. So period. That's it.**

[14:48]
**SIMS: [U/I]**

UNK OFFICER: We got a see to make sure she ain't hurt, man. That's what we keep saying.

[15:22]
UNK OFFICER: I got you. But I'm just saying, we just talking. If you say she's fine, we need to just find out where she is.

**SIMS: I just tell you that.**

UNK OFFICER: Simple as that man.

[15:29]
**SIMS: What's up man? [U/I]**

[15:32]
UNK OFFICER: <laugh>, that ain't gonna work. We need to visually see her. How can we make that happen?

[15:45]
**SIMS: [U/I] Sure.**

[15:49]
UNK OFFICER: She have contact numbers that we can get a hold of her?

[15:58]
UNK OFFICER: We, it's not we need to actually see her.

[15:59]
**SIMS: No, I just told you what the fuck I can do to help. Other than that, that shit can't happen. [U/I] speak to you. Other than that, [U/I]**

UNK OFFICER: Go in your phone and see where she's at or find out where she's at?

**SIMS: Just like how you see me right now?  [U/I]**

UNK OFFICER: So put it in your phone [U/I]

**SIMS: No, no, no. [U/I] the hood. See who comin', who left?**

[16:26]
UNK OFFICER: No, what she's saying is you just said that you could call somebody. They gotta hear your voice. Right.

**SIMS: That's what I was just said.**

[16:33]
UNK OFFICER: Who's gotta hear your voice?

**SIMS: [U/I]**

[16:58]
UNK OFFICER: Basically what we're trying to do is prove that your story is legit and that she's fine and then we good. Then the way you put it we're Gucci. You know what I'm saying? I'm not trying to be a smart ass. I'm trying to help you out. If you're saying she's straight, then what I'm trying to tell you is if she's straight, you're good. So help us find out that she's all right.

9

[17:30]
**SIMS: Then deal with the whole shit later about the car.**


**<u>Sergeant Sullivan BWC</u>**

[00:15]
OFFICER 1: What's your name sir?

**SIMS: U/I**

<overlapping speakers>

OFFICER 1: What's your name sir?

<overlapping speakers>

[00:28]
OFFICER 1: Alright. I don't care about what you put your mouth on that. I ain't even about that. You got anything on you you shouldn't have homie?

UNK OFFICER: What's your name? What's your name?

OFFICER 1: What's your name brother? It's not a trick question. What's your name?

**SIMS: [U/I] I know.**

OFFICER 1: What's your name?

UNK OFFICER: Let's get it over with.

UNK OFFICER: Got ID on you?

OFFICER 1: He put something in his mouth. I don't care nothing about that. What'd you put a rock in your mouth?

[00:56]
SULLIVAN: You gonna get sick, man?

OFFICER 1: Relax, man.

&lt;overlapping speakers&gt;

[01:15]
SULLIVAN: Yeah, come on.

[01:16]
UNK OFFICER: I gonna hang out here for a minute.

UNK OFFICER: Take a picture of him. We'll send it in the chat.

SULLIVAN: [U/I]

UNK OFFICER: How you doing man?

[01:25]
SULLIVAN: Hang on a second. Hey run it through. True inmate got a [U/I]

[01:26]
Speaker 1: Call out? Uh, handcuff.

&lt;unintelligible conversation/overlapping voices&gt;

[01:38]
SULLIVAN: That's good one.

[09:18 AM / 01:39]
UNK OFFICER: Thanks.

[09:18 AM / 01:40]
SULLIVAN: Yeah. Yeah. Oh yeah.

&lt;radio&gt;

[01:47]
SULLIVAN: He's not sayin' nothing. He said, his response was, you know who I am.

[01:53]
SULLIVAN: Yeah. You got a reader? No? Yeah, he's not, it's gonna take a little building up with him. He's not, he threw something in his mouth. He's just, he's scared shitless. Just give us a few alright? Right behind you. [U/I]

[02:12]
OFFICER 1: I respect that-

**SIMS: I ain't runnin' nowhere.**

UNK OFFICER: Sir, can you look at me? Sir?

**SIMS: Go ahead. Y'all know who y'all-**

UNK OFFICER: Look at me my man.

**SIMS: I know who y'all looking for.**

OFFICER 1: Exactly.

**SIMS: Listen, I'm gonna be respectful [U/I].**

<overlapping voices>

OFFICER 1: Exactly. I appreciate that. It makes [U/I]

[02:25]
**SIMS: I shouldn't have paid that nigga shit. For sure. Let's go.**

[3:54]
SULLIVAN: Where is uh, the million dollar question though?

OFFICER 1: Right, right, right.

HEBNER: In in the interest of safety we can ask it.

UNK OFFICER: Hey, uh uh, where's uh Destiny at?

<overlapping speakers>

**SIMS: In the city, homie.**

UNK OFFICER: We're trying to make sure she ain't hurt.

**SIMS:  Man, she ain't hurt homie. I can cash that nigga out. Get the fuck on nigga. Started acting stupid as hell nigga. I left her ass the motherfucking city man.**

OFFICER 1: Where at in the city?

**SIMS: Uh, on Six Mile. Motherfuckin' right there. Six and Grove and shit, bro. I ain't did shit to her nigga.**

OFFICER 1: Well you, you know we need to make sure right?

[04:40]
**SIMS: Yeah. Like I said, look, I ain't did shit to her. She got my kids.**

OFFICER 1: I got that, but you know-

**SIMS: Hey listen, y'all know who the fuck I am.**

OFFICER 1: That ain't it-

**SIMS: And respect. I got you right now. Let me hold the, I'm right now, I'm right now the host of the show. Let me host the-**

OFFICER 1: You're hosting the show, huh?

**SIMS: Listen, like I said no, [U/I]**

OFFICER 1: Okay, go ahead.

**SIMS: You know I done did this shit.**

OFFICER 1: Go ahead.

**SIMS: Like I said, I ain't hurt her.**

OFFICER 1: But we need to confirm that.

**SIMS: I ain't hurt her. You hear me? I just told your ass.**

13

[5:00]
OFFICER 1: Man, well-

**SIMS: I just told you I dropped her off in the hood so...**

OFFICER 1: And she in the hood? Six Mile and you said Six Mile and where?

**SIMS: Yeah. Nah, my hood shit.**

OFFICER 1: Six Mile and where?

**SIMS: Six Greenfield-**

OFFICER 1: Greenfield. Okay.

**SIMS: [U/I]**

OFFICER 1: Not over here. She ain't over here.

[05:15]
**SIMS: I came the fuck down here. You feel me?**

OFFICER 1: Not with her.

**SIMS: No, because y'all went over, there's my little spot seein' all shit from my apartments so like the fuck y'all coming over?**

UNK OFFICER: Whose house is this?

**SIMS: This people [U/I].**

[5:30]
OFFICER 1: Alright, so you asked me to call your people and tell 'em that-

**SIMS: I just told you bro.**

OFFICER 1: Right?

**SIMS: Shit, I just told you bro. I don't know what else fuck to say man.**

14

OFFICER 1: No, I'm just asking. I just wanna clarify what you asking us to do. You want us to call your people?

**SIMS: I just told you bro. I-**

OFFICER 1: That's not a trick question. I'm just asking.

**SIMS: ..said call brother. I'ma let you know [U/I] you shit you [U/I].**

[05:51]
OFFICER 1: But we still need to put eyes on her.

**SIMS: I know. I'm saying like [U/I] show you in the city motherfuckin'-**

OFFICER 1: You put her in a house or you dropped her on the street?

**SIMS: No, on the street.**

OFFICER 1: You dropped your baby mama on the street?

**SIMS: Yeah, at the time and shit. Shit.**

OFFICER 1: Y'all was mad at her?

**SIMS: No.**

OFFICER 1: Did you drop her off in your car or her car?

**SIMS: I dropped her off from the motherfuckin' whip I just copped. It ain't her motherfucking whip shit nigga gang. You feel me? Fuck me. I'm out here moving and groovin' every day. Some shit. Just cop some shit from the motherfucker.**

OFFICER 1: So where the whip at?

**SIMS: Shit be back with homie in a minute. [U/I]**

15